## Board of Control of the Harrisburg School District v. Wilson

C.P. of Dauphin County, no. 2006 CV 3443 EQ.

*Brian P. Gabriel,* for plaintiffs.
*Carl P. Beard,* for defendants.

CLARK JR., *J.,* October 9, 2006—In order to properly illuminate the pertinent issues in this case, we must briefly review the facts that led to our previously issued interim opinion dated June 27, 2006 (docket no. 2006 CV 2489), which interim opinion we hereby incorporate by reference into this writing. In that previous writing, we discussed in great detail the history of the Education Empowerment Act (EEA) (Act of May 10, 2000, P.L. 44, no. 16, §8.1, as amended, 24 P.S. §§17-1701-B—17-1716-B) and its ultimate

affirmation by the Pennsylvania Supreme Court. We also discussed the academic history of the Harrisburg School District and how it became an acutely distressed empowerment district. We refer the reader to that prior interim opinion for a more detailed discussion of those complex issues.

We will, however, generally discuss the EEA and review the background facts leading up to the case at bar. The EEA mandates that if the academic test scores in a school district consistently remain extremely low, the mayor of the city wherein such a school district is located is obligated by law to appoint a board of control. The control board is then given the authority, powers and prerogatives to completely run the affairs of the school district in place of the elected board of school directors. However, the elected board retains "the power to levy taxes." We will explain in greater detail exactly what this "power" means, in the total context of the EEA, and several companion provisions of the Public School Code, inter alia, 24 P.S. §§6-693, 694 and 695.

In that previous case, which led to the issuance of the interim opinion and accompanying interim decree, the control board of the school district was having significant disagreements with the elected board concerning the overall management and operation of the district, especially concerning fiscal issues. In particular, the elected board perceived that it was not being given sufficient information before being directed to approve fiscal resolutions submitted to it (elected board) by the control board. The control board became concerned that the elected board would not affirm certain bank loans or pass the 2006-2007 school tax levy to fund the control board's

proposed budget for the school district's 2006-2007 fiscal school year.

As a result, the control board filed suit in this court to, inter alia, compel the elected board to affirm the bank loans and pass the tax levy, or face removal from office for neglect of duty. The elected board was pre-scheduled to vote on the tax levy and other critical financial obligations on the evening of June 28, 2006. Therefore, we purposely expedited the scheduling of the necessary court proceedings prior to that date so the elected board members would have the benefit of our legal analysis and rulings prior to casting their votes on such matters.

At those prior proceedings, the elected board argued to the court that since the General Assembly specifically granted it (elected board) the power to levy taxes, the elected board members had discretion whether or not to approve a tax levy and to also approve or disapprove the other financial obligations of the district. Therefore, it was the contention of the members of the elected board that if they (elected board) disagreed with or felt that they (elected board) were not sufficiently informed about the control board's proposed budget or other financial obligations, they (elected board) did not have to approve the tax levy or ratify those other obligations.

We issued our interim opinion late in the evening of the same day as the hearing (June 27, 2006). In it we dismissed the elected board's claims and assertions regarding some sort of a perceived inherent right to disregard the directives of the control board pertaining to the ratification of financial obligations which had been already determined by the control board to be in the best

interests of the school district. We stated that to permit the control board to set the annual school district budget and determine the other financial obligations of the district, but give the elected board the discretion to not approve the necessary taxes to fund the budget and/or not ratify the other obligations, would create absolute fiscal chaos in the district. We likened it to having two captains on the same ship. Interim opinion, June 27, 2006, p. 26.

In our interim opinion, we gave a detailed interpretation of the authority, powers and prerogatives given by the General Assembly to the control board and concomitantly withdrawn from the elected board under the EEA. In order to provide the reader with an adequate basis to assess the holdings of this instant opinion, we will now quote, at some significant length, the salient portions of those prior holdings, as articulated in the interim opinion.

"As mentioned above, the control board in this case was appointed pursuant to the acutely academically distressed provision of the EEA, 24 P.S. §17-1707-B. This statute grants boards of control the following powers:

" 'The authority granted to a board of school directors under section 1704-B(a) shall be exercised by the board of control of an education empowerment district certified under this section. The provisions of sections 1705-B(c), (d), (e) and (g), 1706-B and 1708-B(a) shall be applicable to a board of control appointed under subsection (b). The provisions of sections 693, 694 and 695 relating to special boards of control shall apply to a board of control under this section. 24 P.S. §1707-B(c). All statutes

are in title 24 and their complete citations are: section 17-1704-B, section 17-1705-B, section 17-1706-B, section 6-693, section 6-694 and section 6-695' . . . .

"The elected board appears to challenge the right of the control board to seek the court's intervention to force the elected board to pass the tax levy and affirmation of bank loans. However, under section 694, the General Assembly has clearly empowered the control board to require the elected board to pass a tax levy and affirm debts. This section states in relevant part,

" 'When the operation of a distressed school district has been assumed by the special board of control, the board of school directors of the district *shall,* upon recommendation and with the approval of the special board of control, levy an additional tax or taxes sufficient to liquidate the indebtedness of the district. . . .' 24 P.S. §6-694. (emphasis added)

"This language clearly establishes that the elected board must raise a tax when the control board recommends it. We also note that the rest of section 694 grants the control board authority to petition the court of common pleas to issue a writ of mandamus to force the elected board to pass an additional tax.

"Although there is no tax increase for the 2006/2007 school district fiscal year in the case at bar, we find that if the elected board can be compelled to pass an additional tax, it can certainly be compelled to pass its regular tax levy. This is especially true because the elected board has an independent duty to pass tax levies to fund the school district. 24 P.S. §6-601.

"Aside from section 694, we also note the general provision listed in section 695. We recognize that statutes

are sometimes difficult to interpret. Therefore, for the purposes of clarity, we will quote the entire section, but emphasize the critical portions thereof. This section states,

" '*The school directors* of a distressed district may not resign their offices, except with the unanimous consent of the special board of control and shall continue in office, unless removed from office for neglect of duty under the provisions of section 318 of this Act by the court of common pleas of the county in which such district or the largest part in area is located, or unless any of such directors are elected to another position not compatible with the position of school director or are appointed to any position for which there is a requirement that said appointee shall hold no elective office, for the remainder of their terms during the time the district is operated by the special board of control and *shall perform any duties delegated to them by it.* The assumption of control of a distressed school district by the special board of control shall in no way interfere with the regular election or reelection of school directors for the district.' 24 P.S. §6-695. (emphasis added)

"A careful reading of this statute clearly indicates that interlaced within other language concerning how an elected school director might be allowed to lawfully leave office, is the simple, yet powerful directive, '[the elected school directors] shall perform any duties delegated to them [elected school directors] by it [control board].' *Id.* Thus, the control board's authority is clear. The members of the elected board must authorize whatever tax the control board directs them to levy and otherwise satisfy the other fiscal obligations of the school district.

"Finally, as mentioned above, under section 693, as soon as a control board is created, the elected board loses all its authority, powers and prerogatives, save the power to levy taxes. Therefore, as also mentioned earlier, the elected board does not have the authority, power or prerogative to contest the control board's budget and must fund said budget, notwithstanding any objections they (elected board) may have to its content or amount. Section 693 explicitly states, 'the special board of control may require the [elected] board . . . to increase tax levies in such amounts and at such times as is permitted by the Act to which this is an amendment.' 24 P.S. §6-693(2). . . .

"The elected board claims that they are entitled to not pass the tax levy because they have not been given 'enough information' by the control board. Unfortunately, there is no provision in the Public School Code that entitles an elected board to any special information that is not available to the regular public. If the elected board wishes to inquire of or even contest the control board's budget, they are free to attend public meetings and ask questions like any other citizen." Interim opinion, June 27, 2006, pp. 13, 22-25, 27.

We clearly ruled that the elected board had no discretion, but had to approve whatever tax levy the board of control requested. We worked late into the evening hours on June 27, 2006 to ensure that the elected board had the benefit of our ruling prior to its vote. The interim opinion was filed with the prothonotary in the early morning of June 28, 2006, and copies were distributed that day to the parties and their counsels. Our interim opinion apparently had some clarifying effect

on these pertinent issues, since the elected board voted unanimously to affirm the bank loans and pass the tax levy on June 28, 2006. As a result of that vote, the necessity for a hearing on the original petition for removal of the members of the elected board was rendered moot.

Upon being informed of the unanimous vote, we were hopeful that "peace had returned to the valley." Although we could certainly empathize with the elected board upon being informed, via the interim opinion, that they (elected board) were divested of all discretionary authority, powers and prerogatives, and we could likewise understand that the elected board would not likely be too enamored with that situation, we were nevertheless hopeful that they (elected board) would accept the rule of law, and fulfill their sworn duty as that duty had been defined by the General Assembly under the provisions of the EEA. Unfortunately, that was not to be ultimately the case, and the aforementioned "peace" was not to be long lived.

In the spring of 2006, the school district's financial advisors recommended that the district consider performing certain financial transactions, commonly referred to as SWAPS and TRANS. For purposes of this opinion, it is not important to define the exact nature of these rather complex financial transactions, other than to note that such financial undertakings are specifically authorized by the General Assembly to be fiscal vehicles available to school districts to manage their monies in a more efficient fashion, and those same types of transactions had, in fact, been previously undertaken by the school district.

In early July of 2006, the mayor of the City of Harrisburg, the Honorable Stephen R. Reed, in consultation with certain financial advisors and the superintendent of the school district, determined that it was in the school district's significant financial interest to perform these financial transactions and recommended that the control board take prompt action to accomplish these matters. The control board scheduled a public meeting for July 27, 2006 to approve the transactions and also scheduled a public meeting for the elected board for July 31, 2006 for a ratification vote by the elected board. It should be noted that the various lending institutions which were involved in underwriting these multi-million dollar financial transactions absolutely required the ratification vote of the elected board members in order to obtain (at least in the lending institution's opinion) a legally binding pledge of the "full faith and credit" of the taxing power of the school district to guarantee these various financial obligations. Presumably, the lending institutions were relying on the provisions of the Pennsylvania Constitution which limits the right to levy taxes to only elected bodies. However, it is a virtually universal requirement in such large financial undertakings involving governmental entities that the political entity which has taxing power is required to collateralize such matters in that fashion.

In preparation for action by the control board and the elected board in regard to these financial transactions, a rather voluminous packet of background and explanatory materials was assembled. Ms. Julie Anne Mackey, the control board secretary, attempted to distribute these materials to the elected board members for their review, via an email attachment, on or about July 26, 2006. When

Ms. Mackey attempted to transmit the packet electronically she discovered that it was too large to be disseminated in that fashion. As a result, Ms. Mackey promptly had the materials printed, and sent them via United States mail and by private courier service to the individual elected board members at their declared addresses.

On July 27, 2006, the control board passed a resolution approving the SWAPS and TRANS and also specifically directed the elected board to do the same at their pre-scheduled meeting on July 31, 2006. However, on July 31, 2006, for reasons that are at best "unclear" (but not otherwise germane to the decision herein), not one of the nine members of the elected board attended that pre-scheduled meeting. We do not intend to make a specific attribution of fault for the reason(s) why not a single elected board member saw fit to attend that meeting. At this juncture, we will simply note that it was just an amazing coincidence that no one could attend.

However, apparently two elected board members were able to be contacted by telephone that evening, and were thus able to telephonically participate in the meeting. But, alas, notwithstanding the concerted efforts of the superintendent to contact the remaining elected board members by telephone, such efforts failed, and there was an insufficient number of elected board members present by telephone or in person to constitute a quorum, so no official business could be conducted. The result of this failed meeting was that the SWAPS and TRANS that had been approved by the control board on July 27, 2006 were not ratified; and therefore those fiscal endeavors could not be implemented because of the lack of action by the elected board.

Shortly thereafter, on August 2, 2006, the control board, and its constituent members, together with the superintendent (plaintiffs/petitioners), filed their initial petition for removal of seven of the nine elected board members from their public office as school directors for neglect of duty pursuant to 24 P.S. §3-318 (removal statute). These filings were initially docketed to the original civil action at docket no. 2006 CV 2489. The two elected board members who were *not* included as defendants in the initial petition were the two who made themselves available via conference call at the July 31, 2006 elected board meeting.

Due to the fact that the renewed petition for removal was based upon new factual occurrences (*i.e.,* the July 31, 2006 failed meeting of the elected board), which occurrences were not part of the control board's original lawsuit (docket no. 2006 CV 2489), the court determined that it was procedurally proper for the plaintiffs/petitioners to file a new lawsuit and a new petition for removal, inasmuch as the previously alleged anticipated basis for the original removal action was rendered moot by the unanimous positive vote of the elected board at its meeting on June 28, 2006. The new complaint and petition for removal were filed on August 4, 2006 at the above captioned docket.

Although this instant proceeding is captioned, filed and docketed as an action in equity, we note that this proceeding is more properly characterized as a special type of action at law, inasmuch as the General Assembly has provided for a specific statutory removal proceeding at 24 P.S. §3-318 (removal statute). Therefore, this court, in adjudicating this matter, is primarily proceeding on

the basis of a special action at law, and we shall only exercise as much of our equity jurisdiction as may be necessary to fully resolve this matter.

Upon reviewing the complaint and accompanying petition for removal, it became abundantly apparent to us that the previously hoped for and briefly obtained comity between the parties had indeed deteriorated into another unfortunately antagonistic and rather perilous situation between the control board and the elected board. Early on, we became convinced that this was a uniquely acute situation that required an extraordinary attempt to abate the erupting hostility and distrust. Therefore, we determined that the appointment of a combination special master/ombudsman/mediator was in the best interests of the parties, their counsels, the students and ultimately the taxpaying citizens of the school district. Thus, with the consent of the parties, we appointed the Honorable Judge G. Thomas Miller, Esquire, a distinguished former member of this court, as special master/ombudsman/mediator. Unfortunately, despite the skilled, intensive and valiant efforts of Judge Miller, coupled with the good-faith efforts of the experienced counsels for the parties, an accommodation could not be reached, and the sought-after peace eloped from the valley.

On August 8, 2006, the control board re-scheduled another public meeting to afford the elected board a further opportunity to ratify the resolution approving the SWAPS. (Unfortunately, the TRANS could no longer be approved because the deadlines for those transactions had expired; and, therefore, those financial opportunities were apparently lost to the school district

and its constituent taxpayers.) The date of the re-scheduled elected board meeting was August, 21, 2006. As mentioned above, all of the documents necessary for the elected board to analyze the SWAPS had already been provided to the elected board members prior to the July 31, 2006 failed meeting, except for one additional document which was provided to the elected board members before the August 21, 2006 re-scheduled meeting.

Prior to the August 21, 2006 meeting, two members of the elected board, Mr. Ron Burkholder and Ms. Cathy Thomas, resigned their positions for legitimate personal reasons. Those vacant positions were then promptly filled by appointees of the control board, and those appointed members of the elected board were in attendance at the August 21, 2006 meeting.

When the fateful day and time for the re-scheduled meeting arrived, eight members of the elected board eventually appeared and participated in the meeting. The board of control provided three financial consultants to respond to any questions that the elected board members may have had. After almost two hours of questions by the elected board members and responses by the financial consultants and legal counsels, the question was called on the ratifying resolution, and a vote was taken. The vote ended in a 4-4 tie, with the four defendants herein voting in the negative. As a result, the ratifying resolution failed, since it was not approved by a majority of the elected board members.

On August, 28, 2006, the control board filed a motion for leave to file an amended complaint and amended petition. This motion was granted on September 8, 2006,

and an amended complaint and amended petition for removal were filed on September 11, 2006.

The amended complaint and amended petition for removal added the occurrences post July 31, 2006, and especially the re-scheduled meeting of August 21, 2006, and the resulting failed vote as a further basis for removing the above-named members of the elected board (defendants). The amended complaint and petition for removal was filed solely against the four members of the elected board who voted against the ratifying resolution.

After receiving the amended complaint and amended petition for removal, this court issued a rule to show cause on September 11, 2006. This rule scheduled a hearing on the petition for removal for September 26, 2006, which was not less than 10 days nor more than 20 days from the issuance of the rule, as specifically required by the removal statute.

On September 22, 2006, the defendants filed their answer with new matter. The plaintiffs' reply to new matter was filed on September 25, 2006.

On September 26 and 27, 2006, this court held hearings on the plaintiffs' petition for removal. We note that immediately prior to the commencement of the hearing, the plaintiffs agreed to narrow the basis for their contentions for removal and the evidence which they would adduce in support thereof, and to primarily focus on the events that followed the July 31, 2006 failed meeting, and more specifically the events of the August 21, 2006 re-scheduled meeting.

On the first day of the hearings (September 26, 2006), the control board's financial consultant witnesses testified

that had the SWAPS been passed, that such action would have most probably saved the school district millions of taxpayer dollars over the life of those transactions. The experts' analysis was based upon the long-term history of the financial markets, and their substantial experience in such matters. Although we note that the experts could not guarantee any specific results since financial markets are in a state of constant flux, their expert opinions concerning such matters were both reasonable and well-considered. We also note that the defendants did not dispute the experts' conclusions, nor did the defendants offer any type of expert rebuttal testimony concerning these financial matters.

On the second day of the hearings (September 27, 2006), the three defendants who attended the hearing on that day, namely, Ms. Elizabeth N. Wilson, Mr. Karl L. W. Singleton Jr., and Ms. Kia L. Hansard, testified that they did not approve the ratifying resolution because they felt that they did not have enough information to determine whether or not the SWAPS were in the best interest of the school district. They also did not vote in favor of the SWAPS because the results could not be guaranteed by the consultants. In other words, they believed they had the discretion to vote as they chose and not as they were directed by the control board, and in accordance with the previous rulings by this court which were specifically directed to each of them in the detailed holdings of the interim opinion.

These defendants also admitted that they were familiar with the court's analysis and interpretation of the EEA, and their lack of discretion as explained in the interim opinion. Nevertheless, each of the testifying

defendants maintained that despite our prior rulings, they (defendants) still had the discretion to decide whether or not to follow the directives of the control board, and that it was their right to superimpose their individual judgment over the determinations and directives of the control board, the law notwithstanding.

Had the defendants not had the benefit of our detailed analysis of the EEA in our interim opinion, we might be constrained to approach a resolution of this case in a different manner than will be articulated hereafter. However, as acknowledged by the defendants in both the responsive pleadings covering all four defendants and in the testimony of the three defendants at the hearing, it is unmistakably clear that the defendants had actual notice of the court's holdings and willfully and intentionally chose not to follow those holdings. The defendants' self-defined judgment was, nevertheless, willful contempt for the rule of law in this matter.

Based upon the defendants' individual, willful and blatant refusal to approve the SWAPS, we find that they (defendants) each neglected their duty under the law. As we stated in our interim opinion, the EEA, in 24 P.S. §17-1707-B(c), specifically invests in the control board the authority, powers and prerogatives enumerated in 24 P.S. §§6-693, 6-694, and 6-695. Section 693 strips the elected board of all power; section 694 states that the elected board must approve any tax recommended by the control board; and section 695 states that the school directors, "shall perform any duties delegated to them [directors] by it [control board]." Therefore, the elected board had no discretion to disobey a specific resolution enacted by the control board directing them (elected

board) to ratify the SWAPS, and such disobedience was a per se neglect of duty, as a matter of law.

We note that the ability of the General Assembly to divest an elected school board of all of its authority, powers and prerogatives is not new to this Commonwealth. There seemed to be some oblique undercurrent in this case that the EEA brought a whole new array of sweeping, even perceived draconian measures onto the educational scene in this Commonwealth. Nothing could be further from the truth. Indeed, the remedial measures listed in sections 693, 694 and 695, were granted to special boards of control over *four decades ago.* As we explained in our interim opinion,

"The initial instance of legislative limitations upon school districts, and the concomitant modification, conditioning or revocation of the substantial authority, powers, and prerogatives normally granted to a school district and its elected board of school directors, is found in Act no. 675 *of December 15, 1959,* amending the Act of March 10, 1949 (P.L. 30), relating to public education in this Commonwealth, 24 P.S. §6-691 et seq. This statute was originally created to reform and assist school boards that were in a severe state of fiscal crisis, with a resultant situation where the school district became so financially 'distressed' that it created an intolerable burden upon the citizen taxpayers of such district, while at the same time, usually failing to deliver the requisite levels of needed education for the children of the district. This particular statute provided for the revocation of the authority, powers and prerogatives of an elected school board in such a district, and placed those powers, authority and prerogatives in the hands of a specially created body, known

as a special board of control." Interim opinion, pp. 3-4. (emphasis added)

Therefore, the sweeping remedies contained in sections 693, 694, and 695, were created in 1959, *more than 45 years ago,* to allow special boards of control to reform financially distressed school districts. The EEA merely applied those already existing and well-established remedial measures to academically distressed school districts.

Now that we have ruled that the defendants neglected their duty, we also find they can be lawfully removed from office pursuant to 24 P.S. §3-318 (removal statute). Section 318 specifically gives school district taxpayers or a special board of control the authority to initiate a removal proceeding against a board of school directors, or individual members thereof, for, inter alia, refusing or neglecting to perform any duty imposed upon it/them by the Public School Code.

Section 695 specifically mandates that school directors must remain in office unless, inter alia, they are removed by a court of common pleas for neglect of duty pursuant to the provisions of 24 P.S. §3-318 (removal statute). Therefore, the EEA, by adopting section 695, clearly envisions that school directors can be removed from office for neglect of duty in an empowerment district. This is further seen by the adoption in the EEA of section 694 which allows a court to initiate removal of an elected board, subject to the provisions of section 318, if the elected board fails to pass an additional tax levy that was requested by a control board.

Since we have determined that the plaintiffs/petitioners have proven their case, we will now address the de-

fendants' defenses for why they (defendants) should not be removed from office. The defendants first claim that under the Pennsylvania Constitution, Article VI, Section 7, only the Governor can remove an elected official from office if he (Governor) determines that the office holder "misbehaved".

This argument has been previously dealt with by the Pennsylvania Supreme Court in *Georges Township School Directors,* 286 Pa. 129, 133 A. 223 (1926), and more recently affirmed and explained in detail by the Pennsylvania Supreme Court in *South Newton Township Electors v. South Newton Township Supervisor,* 575 Pa. 670, 838 A.2d 643 (2003). *Georges* explains that school directors can be removed from office by a court of common pleas even though they are elected officials because removal statutes predated and were not specifically abrogated by Article VI, Section 7. Therefore, pursuant to *Georges,* as affirmed by *South Newton,* we find the defendants' constitutional claim to be meritless.

The defendants also claim that there is no obligation on each individual school director to approve every resolution of the control board so long as the resolution somehow passes by a majority. In the case at bar, the defendants claim that but for technical difficulties, another elected board member (who was absent the evening of August 21, 2006) would have called in via telephone, voted in favor of the resolution, and the ratifying resolution would have passed.

We find this argument to be frivolous. We first note that section 695 specifically refers to "school directors" and not to an elected board. Therefore, it is the individual duty of each school director in an empowerment

district under the EEA, to personally obey the directives of the board of control. Further, it would be illogical for us to find that a board has a duty that its individual members do not share. We find, as a matter of law, that the provisions of 24 P.S. §5-508 requiring that resolutions by an elected board only need to be passed by a majority vote of the school directors is inapplicable to an elected board in an empowerment district under the EEA. In short, discretion resides in the members of the control board, but *not* in the members of the elected board, under the mandates of the EEA.

The defendants also claim that the control board has violated numerous statutes by not answering questions at public meetings, not passing the budget in a timely fashion, and ordering the elected board to not meet without prior approval by the control board. We find these issues to be irrelevant to the singular issue of neglect in the case at bar and those assertions have no bearing on whether the individual defendants neglected their legal duty to obey the directives of the control board.

Finally, the defendants raise numerous claims that they (defendants) were merely trying to make prudent decisions and were not given enough information by the control board. As we have previously discussed, these claims present no defense for the elected board members because they had no authority to disregard the specific directives of the control board.

We note that concomitantly with the elected board's loss of all discretionary power, they (elected board) also have no legal liability for any decisions made and enforced by the control board. Once a control board takes over a school district, that control board assumes all

responsibility and liability for their actions and the elected board members have absolute immunity, provided they (elected board) act in strict conformance with the specific directives of the control board. In essence, the elected board members in an empowerment district under the EEA have been temporarily relegated to the function of public office caretakers by the General Assembly. They are maintaining their positions on the elected board until the school district's test scores rise to the point where the elected board members can once again resume full control over the district and its affairs. In that respect, it certainly is in the interests of the elected board members to support and assist the control board in its remedial endeavors, so as to accelerate the academic improvement of the school district, thereby returning the control of the district to the elected board as soon as possible.

We recognize that it may be quite difficult for the defendants to gracefully accept that they have no independent authority, powers or prerogatives. And we believe that it is no coincidence that the same statute which orders the elected board to obey the control board (section 695), also discusses how elected board members can be removed from office. However, we would like to point out that the school district became an empowerment district on December 19, 2000, long before any of the defendants came into public office. Therefore, the defendants had a responsibility to investigate and discover the severely restricted scope of their public office *before* they accepted their positions. The defendants cannot change the authority, powers and prerogatives of their public office merely because the current situation may be distasteful to them. Only the General Assembly can

define the authority, powers and prerogatives of a school director since it (General Assembly) is granted the exclusive power in our Commonwealth to implement, maintain and support public education under Article III, Section 14, of the Pennsylvania Constitution.

The doctrine of the separation of powers is a fundamental tenant of our Pennsylvanian and American legal and political heritage. If any elected official could self-expand the authority, powers and prerogatives of his/her public office, which public office had been created and defined by the General Assembly, that would be a recipe for the speedy demise of the rule of law and the very antipathy of the bedrock principles of democratic government established by our founding fathers.

Although we can empathize with the defendants' feelings of discomfort, or even personal angst, we cannot condone the willful, blatant and unlawful conduct that has occurred, and which unlawful conduct appears likely to re-occur in the future. Therefore, we are constrained to take decisive action to remedy these matters under the provisions of the removal statute. Despite the individual defendants' personal wishes or beliefs, they each had a clear legal duty to follow the directives of the control board. Instead, they willfully decided to ignore that duty. Such action is clearly unlawful under these circumstances, and endangered vital financial transactions that the control board lawfully determined were in the best interests of the school district. Such actions by the individual defendants do not constitute a legally recognizable method of protesting a law that one does not agree with; it is, quite simply, a neglect of legal duty. The proper vehicle for redress of perceived grievances

in this case is to take those matters to the origin of these laws, the General Assembly, and request their further review and consideration of the same. Likewise, it is not for the judiciary to re-write the laws of our Commonwealth. Only in those rare instances where a statute is plainly offensive to the Constitution may the judiciary intervene in such affairs. This case is certainly not one of those rare instances. The Constitution of our Commonwealth accords full and complete deference to the General Assembly on matters of public education. In this instant matter, we will do no less.

Wherefore, after a full hearing in the matter of whether or not the individual defendant members of the elected board should be removed from public office on account of a neglect of legal duty, we find that the said defendants, to wit, Elizabeth N. Wilson, Shirley Jackson, Karl L. W. Singleton Jr., and Kia L. Hansard, have indeed neglected their legal duty and are therefore subject to removal from public office, pursuant to the statutory removal provisions of the Public School Code, 24 P.S. §3-318 (removal statute). Therefore, we have, by separate order issued of even date herewith, directed the immediate removal from public office as school directors for the Harrisburg School District, said defendants, to wit, Elizabeth N. Wilson, Shirley Jackson, Karl L. W. Singleton Jr., and Kia L. Hansard. It is further directed in such order that the said defendants shall not be eligible to again hold public office as school directors for a period of five years from the date of that order, pursuant to the mandatory provisions of the removal statute.

We further note that pursuant to the removal statute, we are specifically required to make an assessment of

the costs of proceedings, and impose those costs upon a possible limited array of individuals and/or the school district. Although we are accorded some discretion in making such an assessment, we find that this unfortunate situation was not brought by the actions of the members of the control board, or the superintendent (plaintiffs/ petitioners); and so, no such assessment against any of them would be warranted. We likewise find that the school district and its constituent taxpayers should certainly not bear the additional burden of any such assessment, especially considering the fact that the district has already lost at least some of the significant benefits of the proposed financial undertakings that were willfully and unlawfully not approved by the defendants, and it (school district) has had to shoulder the costs of these proceedings to date.

So, by the process of elimination, we arrive at the final group of individuals, the defendants, who were, in fact, directly responsible for the costs of proceedings incurred by the school district, by and through the necessary expenditures of public funds by the plaintiffs/petitioners acting on behalf of the interests of the district. The court specifically finds that it was the knowing and willful actions of the individual defendants by defying the law and failing to follow their clearly defined legal duties which resulted in the expenditure of substantial sums of taxpayer monies to prosecute this action in court; and said defendants should be responsible to repay every penny of those monies to the shareholders of the school district.

Therefore, the court has also issued a separate order of even date herewith, directing that a judgment, in the

full amount of $48,000, shall be immediately entered by the prothonotary against each of the individual defendants, to wit, Elizabeth N. Wilson, Shirley Jackson, Karl L. W. Singleton Jr., and Kia L. Hansard, jointly and severally, and in favor of the Harrisburg School District as an award of the costs of proceedings; and the school district shall be at complete liberty to immediately execute upon such judgment, as the board of control and the superintendent deem appropriate to the interests of the district.

The court specifically finds that the award of costs in said amount to the school district, pursuant to the affidavit of costs submitted by the school district during the hearing, constitutes very reasonable attorneys' fees, together with other necessary legal expenses and costs, filing fees, service fees and miscellaneous expenses, for the period of August 1, 2006 through the end of the hearings. We further specifically find that such an award of costs is absolutely warranted, as a matter of law, especially considering the fact that none of this unfortunate litigation, and its consequent loss of public educational assets, would have had to occur if the defendants would have simply obeyed the law and their legal duty pursuant thereto. It should be noted that had we construed the removal statute to also include damages in the calculation of the costs of proceedings, the amount of said award would have likely been many times greater, as a reflection of the economic harm that was visited upon the school district by the knowing, willful and unlawful actions of the removed defendants. However, we also note that the above awarded costs do not include any such assessment of damages in this case.

The removal statute also obliges us to appoint qualified persons to fulfill the remaining terms of office of the said removed defendants. Considering the obvious statutory intent of the General Assembly in enacting the EEA, which directs the mayor to initially appoint the members of the control board, and then empowers the control board to appoint persons to fill regular vacancies that may occur on the elected board from time to time, we find that it would be most appropriate to request that the control board and superintendent (plaintiffs/petitioners), in consultation with the mayor, submit a motion to the court, within five business days of the filing of this opinion and accompanying order, containing the names of four qualified persons to serve in the stead of the four removed school directors (defendants).

Due to the substantial harm that has already been caused to the school district by the defendants' willful and unlawful actions, they (defendants) are further denied any supersedeas, particularly under Rule 1736(b) of the Pennsylvania Rules of Appellate Procedure, which might otherwise accrue to them. We take this preemptive action to prevent further harm to the school district, in the absence of which preemption the said defendants would be able to automatically stay the effect of the orders we have entered. We would be derelict in our duties to the taxpayers of the school district to do less in these extraordinary circumstances.

We further deny the defendants the right to automatically appeal these rulings pursuant to Pa.R.A.P. 1736(a). However, the defendants shall be permitted to appeal these rulings, provided they post a cash bond in the full amount of $100,000, paid into court through the Protho-

notary of Dauphin County, which bond shall be liable for debit for the payment of any future costs incurred by the school district, including reasonable attorneys' fees, costs and expenses associated with any such further litigation in this matter.

Issued at Harrisburg, October 9, 2006.

## ORDER OF REMOVAL

Pursuant to the provisions of the Public School Code of this Commonwealth, more particularly, 24 P.S. §3-318 (removal statute), the court, after conducting a full hearing on the petition for removal filed by the above-named plaintiffs/petitioners requesting the court to determine whether or not the individual, above-named defendants, who are members of the elected Board of School Directors of the Harrisburg School District, should be removed from public office on account of a neglect of legal duty, we find that the said defendants, to wit, Elizabeth N. Wilson, Shirley Jackson, Karl L. W. Singleton Jr., and Kia L. Hansard, have indeed neglected their legal duty and are therefore subject to removal from public office, as more fully discussed in the formal opinion which we issued of even date herewith.

Wherefore, it is hereby ordered, that effective immediately, the above-named defendants, to wit, Elizabeth N. Wilson, Shirley Jackson, Karl L. W. Singleton Jr., and Kia L. Hansard, are removed from public office as School Directors for the Harrisburg School District.

It is further ordered that the said defendants shall not be eligible to again hold public office as school directors for a period of five years from the date of this order,

pursuant to the mandatory provisions of the removal statute.

Due to the substantial harm that has already been caused to the school district by the defendants' willful actions, they (defendants) are further denied any supersedeas, particularly under Rule 1736(b) of the Pennsylvania Rules of Appellate Procedure, which might otherwise accrue to them. Likewise, we further deny the defendants the right to automatically appeal these rulings pursuant to Pa.R.A.P. 1736(a).

However, the defendants shall be permitted to appeal these rulings, provided they post a cash bond in the full amount of $100,000, paid into court through the Prothonotary of Dauphin County, which bond shall be liable for debit for the payment of any future costs incurred by the school district, including reasonable attorneys' fees, costs and expenses associated with any such further litigation in this matter.

Issued at Harrisburg, October 9, 2006.

## ORDER FOR NOMINATION

Pursuant to the provisions of the Public School Code of this Commonwealth, more particularly, 24 P.S. §3-318 (removal statute), the court, after conducting a full hearing on the petition For removal filed by the above-named plaintiffs/petitioners requesting the court to determine whether or not the individual, above-named defendants, who are members of the elected Board of School Directors of the Harrisburg School District, should be removed from public office on account of a neglect of legal duty, we find that the said defendants, to wit, Elizabeth N. Wilson, Shirley Jackson, Karl L. W. Singleton Jr., and

Kia L. Hansard, have indeed neglected their legal duty and are therefore subject to removal from public office, as more fully discussed in the formal opinion which we issued of even date herewith.

Furthermore, it is incumbent upon this court, and is required by law, that the court appoint qualified persons who are residents of the Harrisburg School District to fulfill the remainder of the unexpired terms of office of the elected board of school directors in the stead of the above-named defendants who have been removed from office pursuant to the removal statute.

Wherefore, the court hereby directs that the plaintiffs/petitioners, in consultation with the mayor of the City of Harrisburg, the Honorable Stephen R. Reed, submit a nominating motion to this court containing the names of four qualified residents of the district who are willing to serve as school directors for the remainder of the unexpired terms of office of the four removed members of the elected board (defendants). The court requests that such motion be submitted within five business days of the entry of this order. Upon receipt of such motion, the court will promptly consider the same for appointment.

It is further ordered, that due to the substantial harm that has already been caused to the school district by the defendants' willful actions, they (defendants) are further denied any supersedeas, particularly under Rule 1736(b) of the Pennsylvania Rules of Appellate Procedure, which might otherwise accrue to them. Likewise, we further deny the defendants the right to automatically appeal these rulings pursuant to Pa.R.A.P. 1736(a).

However, the defendants shall be permitted to appeal these rulings, provided they post a cash bond in the full amount of $100,000, paid into court through the Prothonotary of Dauphin County, which bond shall be liable for debit for the payment of any future costs incurred by the school district, including reasonable attorneys' fees, costs and expenses associated with any such further litigation in this matter.

Issued at Harrisburg, October 9, 2006.

## ORDER OF COSTS

Pursuant to the provisions of the Public School Code of this Commonwealth, more particularly, 24 P.S. §3-318 (removal statute), the court, after conducting a full hearing on the petition for removal filed by the above-named plaintiffs/petitioners requesting the court to determine whether or not the individual, above-named defendants, who are members of the elected Board of School Directors of the Harrisburg School District, should be removed from public office on account of a neglect of legal duty, we find that the said defendants, to wit, Elizabeth N. Wilson, Shirley Jackson, Karl L. W. Singleton, Jr., and Kia L. Hansard, have indeed neglected their legal duty and are therefore subject to removal from public office, as more fully discussed in the formal opinion which we issued of even date herewith.

Furthermore, it is incumbent upon this court, and is required by law, that the court make an assessment of the costs of proceedings associated with legal proceedings undertaken by the plaintiffs/petitioners pursuant to the removal statute.

Wherefore, the court hereby enters an award of costs in favor of the Harrisburg School District, in the full amount of $48,000, and against each of the said defendants. The Prothonotary of Dauphin County is hereby ordered to immediately enter onto the official records of his office, a judgment in the full amount of the above awarded costs $48,000 in favor of the Harrisburg School District, and shall index the same, jointly and severally, against each of the individual defendants, to wit, Elizabeth N. Wilson, Shirley Jackson, Karl L. W. Singleton Jr., and Kia L. Hansard. The prothonotary may issue a writ of execution on said judgment to the Harrisburg School District upon the filing of a proper praecipe requesting the same.

It is further ordered, that due to the substantial harm that has already been caused to the school district by the defendants' willful actions, they (defendants) are further denied any supersedeas, particularly under Rule 1736(b) of the Pennsylvania Rules of Appellate Procedure, which might otherwise accrue to them. Likewise, we further deny the defendants the right to automatically appeal these rulings pursuant to Pa.R.A.P. 1736(a).

However, the defendants shall be permitted to appeal these rulings, provided they post a cash bond in the full amount of $100,000, paid into court through the Prothonotary of Dauphin County, which bond shall be liable for debit for the payment of any future costs incurred by the school district, including reasonable attorneys' fees, costs and expenses associated with any such further litigation in this matter.

Issued at Harrisburg, October 9, 2006.